UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

KENNETH THOMAS,

                    Petitioner,

    v.

D.W. NEVEN, *et al.*,

                    Respondents.

Case No. 3:15-cv-00071-MMD-WGC

ORDER

## I.    SUMMARY

Petitioner Kenneth Thomas filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. This matter is before the Court for adjudication of the merits of the remaining grounds in Thomas' counseled amended petition ("Amended Petition"). For the reasons discussed below, the Court denies the Amended Petition, denies a certificate of appealability, and directs the Clerk of Court to enter judgment accordingly.

## II.    BACKGROUND

Thomas' convictions are the result of events that occurred in Clark County, Nevada on or between March 16, 2008, and March 19, 2008. (ECF No. 21-7.) During the grand jury proceedings, a detective testified that the body of Heinz Wietfeldt was found in the rear cargo compartment of his 2000 Cadillac Escalade on March 19, 2008. (ECF No. 21-4 at 35-36, 38.) Wietfeldt had been shot numerous times, including in the forehead, had a cloth inside his mouth, had "duct tape going around his head," and had his arms and ankles bound. (*Id.* at 54-56, 59.)

Approximately one week prior, Wietfeldt's neighbor witnessed an individual trying to burglarize Wietfeldt's residence. (*Id.* at 39-40.) That neighbor followed the individual and got his license plate number. (*Id.* at 40.) That vehicle belonged to Thomas. (*Id.*) Law

enforcement located Thomas and took him into custody on unrelated charges and detained his passenger, Simone Taylor. (*Id.* at 45.)

Taylor's cellular telephone number was found in Wietfeldt's cellular telephone records. (*Id.* at 65.) Taylor indicated that she was a prostitute, had met Wietfeldt through a communication service, and had gone on a few dates with him. (*Id.* at 66-67.) During later interviews, Taylor indicated that Thomas, her boyfriend, and another individual, David Jones, planned to rob Wietfeldt one day while Wietfeldt was at her apartment. (*Id.* at 87-88, 110.) Thomas and Jones bound Wietfeldt, and Taylor went to Wietfeldt's residence and took a pistol and four thousand dollars from his safe. (*Id.* at 110.) Thomas and Jones put Wietfeldt into a plastic tub and transported him to an apartment complex. (*Id.* at 89.) When they arrived at the apartment complex, Wietfeldt's body was "dumped out of the plastic container into the back of the truck and . . . as they drove away from the [apartment] complex[,] . . . Thomas was in the back seat and . . . shot the victim." (*Id.* at 111.)

Thomas was indicted along with Jones and Taylor on the following charges: burglary while in possession of a firearm, murder with the use of a deadly weapon where the victim was 60 years of age or older, conspiracy to commit murder, first-degree kidnapping with the use of a deadly weapon where the victim was 60 years of age or older, conspiracy to commit kidnapping, robbery with the use of a deadly weapon where the victim was 60 years of age or older, and conspiracy to commit robbery. (ECF No. 21-7.) Thomas pleaded not guilty and a trial date was set. (ECF No. 21-10 at 6-7.) The State filed a notice of intent to seek the death penalty. (ECF No. 21-12.) Thereafter, Thomas agreed to plead guilty to all counts in the original indictment in return for the State agreeing to withdraw the notice of intent to seek the death penalty and to dismiss another case in which Thomas was charged with possession of a firearm by an ex-felon. (ECF Nos. 23-15 at 4, 23-16.) Thomas was sentenced to life without the possibility of parole. (ECF No. 23-20.)

1    Thomas did not file a direct appeal. Instead, on July 8, 2011 and December 14,

2    2011, he moved to withdraw his guilty plea. (ECF Nos. 23-21, No. 24-1.) The state

3    district court denied the motions. (ECF Nos. 23-24, 24-4.) Thomas appealed, and the

4    Nevada Supreme Court dismissed the appeal as untimely. (ECF No. 24-13.)

5    Before the appeal of his second motion to withdraw his guilty plea was resolved,

6    Thomas filed a state habeas petition and a counseled supplemental petition. (ECF Nos.

7    24-12, 24-18.) Following an evidentiary hearing, the state district court denied the

8    petition. (ECF Nos. 25-12, 25-19.) Thomas appealed, and the Nevada Supreme Court

9    affirmed. (ECF No. 26-22.) Remittitur issued on January 6, 2015. (ECF No. 26-23.)

10    On June 5, 2015 and June 9, 2015, Thomas filed two new motions to withdraw

11    his guilty plea. (ECF Nos. 27-1, 27-3.) The state district court denied the motions. (ECF

12    No. 27-14.) Thomas appealed, and the Nevada Supreme Court reversed and remanded

13    to the state district court to construe the motions as a habeas petition and give Thomas

14    the opportunity to overcome the applicable procedural bars. (ECF No. 27-18.) Remittitur

15    issued on April 29, 2016. (ECF No. 27-19.)

16    On May 19, 2016, Thomas filed a "supplemental brief to [his] post-conviction

17    motion to withdraw guilty plea." (ECF No. 43-3.) The state district court denied the

18    petition on October 11, 2016. (ECF No. 43-8.) Thomas appealed, and the Nevada Court

19    of Appeals affirmed on July 12, 2017. (ECF No. 43-15.) Remittitur issued on August 9,

20    2017. (ECF No. 43-16.)

21    Thomas filed his pro se federal habeas petition on February 2, 2015. (ECF No. 1-

22    1.) On July 6, 2016, Thomas' counsel filed a notice of no amended petition. (ECF No. 18.)

23    Respondents moved to dismiss Thomas' petition, and Thomas moved for the

24    appointment of new counsel. (ECF Nos. 19, 33.) This Court granted Thomas' motion for

25    new counsel and denied Respondents' motion to dismiss without prejudice. (ECF No. 36.)

26    Thomas' new appointed counsel filed this Amended Petition on February 2, 2018.

27    (ECF No. 40.) Respondents again moved to dismiss. (ECF No. 42.) This Court granted

28    the motion in part. (ECF No. 46.) Specifically, this Court dismissed Ground 2(6) as

untimely and determined that Ground 2(2) was unexhausted and procedurally defaulted. (*Id.* at 10.) Regarding Ground 2(2), this Court deferred determination of whether Thomas could establish cause and prejudice to overcome the procedural default until a merits consideration. (*Id.*) Respondents answered the remaining grounds in the Amended Petition on January 3, 2019. (ECF No. 49.) Thomas replied on January 14, 2019. (ECF No. 50.)

In his remaining grounds for relief, Thomas asserts the following violations of his federal constitutional rights:

> 1. His guilty plea was not knowingly, intelligently, or voluntarily entered because the guilty plea canvass was not individualized and was not complete.
> 2(1). His trial counsel failed to advise the state district court of his mental deficiencies at the time the plea was taken, failed to wait until the psychological report was completed prior to entering the plea, and failed to utilize any of the steps recommended by the expert to help him understand the plea process.
> 2(2). His trial counsel failed to challenge the death penalty prior to the entry of the plea agreement.
> 2(3). His trial counsel failed to file a notice of appeal.
> 2(4). His trial counsel misrepresented the sentence.
> 2(5). His trial counsel misrepresented the role of an investigator.

(ECF No. 40.)

## III. LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

4

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

///

///

## IV.   DISCUSSION

### A.  Ground 1

In Ground 1, Thomas asserts that his federal constitutional rights were violated because his plea was not voluntary, knowing, or intelligent. (ECF No. 40 at 7). Thomas alleges that his guilty plea canvass was not individualized because it was overly leading, not tailored to account for his low education or comprehension, and failed to advise him of the potential punishments he faced. (*Id.* at 8.) Thomas also alleges that his guilty plea canvass was not complete because it omitted any factual basis by him that he participated in the murder. (*Id.* at 9.) In Thomas' appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> Appellant contends that his plea was invalid because he did not understand the plea agreement and consequences and the district court did not adequately canvass him. We conclude that appellant has failed to demonstrate that his plea was not knowingly, voluntarily, and intelligently entered. At the plea canvass, appellant affirmed that he read and understood the plea agreement, that he did not have any questions about it, that he was pleading guilty because he believed it was in his best interest, and that he had committed each of the offenses to which he was pleading guilty. The plea agreement informed appellant of the possible sentences and the rights that he was waiving by pleading guilty.

> While appellant acknowledges on appeal that the district court was not required to conduct a "ritualistic oral canvass," appellant contends that the oral canvass here was insufficient because appellant had a low IQ and low reading and spelling abilities. We disagree. Appellant's claim as to his mental deficiencies is based on conclusions in a psychological evaluation that was conducted for mitigation purposes prior to the plea. The psychologist who conducted the evaluation testified at the evidentiary hearing that she did not evaluate appellant's competency and would have told counsel if she had any doubts about his ability to understand the proceedings. The psychologist further testified that appellant could be made to understand the terms of the plea agreement. Trial counsel testified that he read and explained the plea agreement to appellant, and that he had no indication that appellant was unable to comprehend the plea agreement or proceedings. Appellant has failed to demonstrate that his mental deficiencies rendered him unable to understand the proceedings. *See* NRS 178.400; *see also Godinez v. Moran*, 509 U.S. 389, 396-97 (1993); *Dusky v. United States*, 362 U.S. 402, 402 (1960). Therefore, we conclude that the district court did not err in denying this claim.

Appellant also contends that the plea canvass was defective as to the murder count because counsel, and not appellant, answered "yes" to the district court's question as to whether he committed murder with the use of a deadly weapon. We conclude that appellant has failed to demonstrate that his plea to murder was invalid. The record shows that counsel was merely clarifying the theory of liability. As discussed above, the totality of the circumstances supports the district court's finding that appellant entered a valid plea of guilty. Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 26-22 at 2-4.) The Nevada Supreme Court's rejection of Thomas' claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

On January 6, 2011, Thomas changed his pleas to guilty, and the state district court canvassed Thomas about his change of pleas. (ECF No. 23-15 at 5-9.) In response to the state district court's questions, Thomas indicated that he was aware of the plea negotiations, that he had no questions of his trial counsel or the state district court, that his pleas of guilty were freely and voluntarily given, that he read the plea agreement before he signed it, that he understood the plea agreement, that he understood that the matter of sentencing was entirely up to the state district court, and that he believed the plea negotiations were in his best interest given the facts of the case. (*Id.* at 5-7.) The following colloquy then took place between Thomas and the state district court:

THE COURT:          Sir, what did you do as a general proposition that caused you to enter your pleas of guilty to these counts?

DEFENDANT THOMAS:   I agreed to do a robbery with Ms. Taylor.

THE COURT:          Did you enter an abode with a firearm for the purpose of stealing or committing a battery on someone?

DEFENDANT THOMAS:   Yes, sir.

THE COURT:          Did you murder someone with use of a deadly weapon?

| [Thomas' trial counsel]: | As a conspirator theory; yes, sir, Judge. The issue is who pulled the trigger. |
| THE COURT: | The victim [was] 60 years of age or older; is that correct? |
| DEFENDANT THOMAS: | Yes, sir. |
| THE COURT: | And Count 3 is conspiracy and, as you've indicated, there was a conspiracy; is that correct, sir? |
| DEFENDANT THOMAS: | Yes, sir. |
| THE COURT: | And you did kidnap an individual 60 years of age or older; is that correct? |
| DEFENDANT THOMAS: | Yes, sir. |
| THE COURT: | Again, with the use of a weapon; is that correct? |
| DEFENDANT THOMAS: | Yes, sir. |
| THE COURT: | And you did conspire or agree with your co-defendant to kidnap this person; is that correct? |
| DEFENDANT THOMAS: | Yes, sir. |
| THE COURT: | You did, in fact, rob this person with a deadly weapon, and the person being 60 years of age or older; is that correct? |
| DEFENDANT THOMAS: | Yes. |
| THE COURT: | And, lastly, sir, you did agree and discuss this robbery with your codefendants; is that correct? |
| DEFENDANT THOMAS: | Yes, sir. |

(*Id.* at 8-9.) Thereafter, the state district court found Thomas' "pleas of guilty [were] freely and voluntarily given, [Thomas] underst[oo]d[ ] the nature of the offense and the consequences of his pleas." (*Id.* at 9.)

Thomas' plea agreement, which was filed during his change of plea hearing, provided the following potential sentences for murder with the use of a deadly weapon upon a person 60 years of age or older: life without the possibility of parole plus a

consecutive term of one to twenty years for the deadly weapon and age enhancements, life with the possibility of parole after twenty years plus a consecutive term of one to twenty years for the deadly weapon and age enhancements, or 20 to 50 years plus a consecutive term of one to twenty years for the deadly weapon and age enhancements. (ECF No. 23-16 at 3.) The plea also provided that Thomas had discussed the elements of the charges with his trial counsel; that he understood the nature of the charges against him; that his trial counsel had explained the elements of the charges, the consequences of his pleas, his constitutional rights, and his waiver of those constitutional rights; and that his trial counsel answered all of his questions regarding the guilty plea agreement and its consequences. (*Id.* at 7-8.)

On February 7, 2011, between Thomas' change of plea hearing and his sentencing hearing, Dr. Shera Bradley, a licensed psychologist, submitted a mitigation evaluation report on Thomas. (ECF No. 24-12 at 59.) Dr. Bradley concluded that "Thomas experienced trauma, instability, chaos, and engaged in negative relationships throughout his life." (*Id.* at 78.) Dr. Bradley also concluded that "Thomas's development was delayed" and that he had "decreased [cognitive] capacities." (*Id.* at 74-75.)

Two years later, on June 14, 2013, Dr. Bradley testified at Thomas' post-conviction evidentiary hearing that she completed the mitigation evaluation on Thomas in 2010 at the request of Thomas' trial counsel. (ECF No. 25-12 at 5.) In conducting her evaluation, Dr. Bradley "interviewed [Thomas] on several occasions[,] reviewed records sent by the attorney[,] completed some psychological testing including IQ, achievement testing, personality testing, and interviewed collateral sources." (*Id.* at 6.) Following her testing, Dr. Bradley determined that Thomas' IQ scores were in the 80s, "[w]hich put him in a borderline intellectual functioning range," meaning that "his scores were at least one standard deviation below the means." (*Id.*) In other words, Thomas' IQ scores were "in between the mentally retarded range and average range." (*Id.*) Dr. Bradley also determined that Thomas' reading score was at a third-grade level and his sentence comprehension score was at a seventh-grade level. (*Id.*) After analyzing the guilty plea

9

agreement, Bradley testified that she thought Thomas "would have a lot of difficulty reading [the plea agreement] on his own." (*Id.* at 6-7.) However, she explained that it was possible that "the ideas communicated in the Guilty Plea Agreement could be communicated to Mr. Thomas through his attorney at a level that he might comprehend." (*Id.* at 8.) Although Dr. Bradley did not determine Thomas' competency, she explained that "if [she] had concerns about [Thomas'] ability to work with his attorney[, she] would have brought them up." (*Id.*)

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated: a "plea of guilty entered by one fully aware of the direct consequences . . . must stand unless induced by threats . . . , misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business." *Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957), *rev'd on other grounds*, 356 U.S. 26 (1958)); *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the longstanding "test for determining the validity of guilty pleas" is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant"); *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) ("A waiver is voluntary if, under the totality of the circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement.").

Although a plea may not be produced "by mental coercion overbearing the will of the defendant," a guilty plea made following "the post-indictment accumulation of evidence [that] convince[s] the defendant and his counsel that a trial is not worth the

agony and expense to the defendant and his family" is not "improperly compelled." *Brady*, 397 U.S. at 750 (reasoning that "mental coercion" is only found if the defendant "did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty"). Accordingly, a guilty plea is not rendered invalid when it has been "motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Id.* at 750.

In *Blackledge v. Allison*, the Supreme Court addressed the evidentiary weight of the record of a plea proceeding when the plea is subsequently subject to a collateral challenge. *See* 431 U.S. 63 (1977). While noting that "the barrier of the plea . . . proceeding record . . . is not invariably insurmountable" when challenging the voluntariness of his plea, the Court stated that, nonetheless, the defendant's representations, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity." *Id.* at 74; *see also Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a strong presumption of truth."); *Little v. Crawford*, 449 F.3d 1075, 1081 (9th Cir. 2006).

Further, a criminal defendant may not plead guilty unless he does so competently. *See Godinez v. Moran*, 509 U.S. 389, 396 (1993). In order to meet the competency standard to plead guilty, it must be determined "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and a 'rational as well as factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

The record supports a finding that Thomas met the competency standard outlined in *Godinez* along with the standards assessing whether his plea was knowing, voluntary, and intelligent. As such, the Nevada Supreme Court's conclusion that Thomas failed to

1    demonstrate that his plea was not knowingly, voluntarily, and intelligently entered and

2    failed to demonstrate that his mental deficiencies rendered him unable to understand

3    the proceedings was reasonable.

4         Thomas contends that his plea canvass was not individualized. (ECF No. 40 at

5    8.) Although the state district court asked Thomas primarily yes or no questions, did not

6    appear to modify its questions to account for Thomas' slightly lower intellectual abilities,

7    and did not include the possible sentences that Thomas faced, Thomas fails to

8    demonstrate that his plea was not knowing, voluntary, intelligent, or competent. Indeed,

9    Thomas answered all of the state district court's questions, indicated that he had no

10   questions of his own, stated that his pleas of guilty were freely and voluntarily given, and

11   answered in the affirmative when asked if he understood the plea agreement, which

12   outlined the consequences of his plea—including the three potential sentences for

13   murder—and the waiver of his rights. (ECF No. 23-15 at 5-9; *see also* ECF No. 23-16.)

14   Further, Dr. Bradley testified that if she had concerns about Thomas' competency, she

15   would have brought those up. (ECF No. 25-12 at 8.) Dr. Bradley's lack of concern

16   regarding Thomas' competency does not support a conclusion that the state district

17   court's lack of an individualized plea canvass was erroneous. *See, e.g.*, *Sandgathe v.*

18   *Maass*, 314 F.3d 371, 379 (9th Cir. 2002) (reasoning that the petitioner "offered no

19   evidence for his asserted incompetence to plead" because the doctor who met the

20   petitioner prior to him entering his plea had no concerns about the petitioner's

21   prescription drug use on his ability to defend himself in court). Therefore, Thomas fails

22   to demonstrate that the plea canvass failed to "make sure he ha[d] a full understanding

23   of what the plea connote[d] and of its consequence." *Boykin*, 395 U.S. at 243-44;

24   *Blackledge*, 431 U.S. at 78.

25        Turning to Thomas' final contention that his plea canvass omitted the factual

26   basis of the murder court, it is true that Thomas' trial counsel—rather than Thomas—

27   responded to the state district court question asking Thomas if he "murder[ed] someone

28   with [the] use of a deadly weapon." (ECF No. 23-15 at 8-9.) However, there is no

requirement that a defendant must admit his guilt for his guilty plea to be effective. *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) ("[W]hile most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."). Therefore, this argument lacks merit.

Accordingly, as the Nevada Supreme Court reasonably determined, after "considering all of the relevant circumstances surrounding" Thomas' plea, *Brady*, 397 U.S. at 749, Thomas fails to demonstrate that he lacked a "rational as well as factual understanding of the proceedings against him," *Dusky*, 362 U.S. at 402, or that his guilty plea was not entered into knowingly, intelligently, and voluntarily, *Brady*, 397 U.S. at 748. Thus, Thomas is denied federal habeas relief for Ground 1.

## B.  Ground 2

In Ground 2, which includes five subparts, Thomas claims that his federal constitutional rights were violated because his trial counsel was ineffective. (ECF No. 40 at 11.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate: (1) that the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the

errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires the petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *See id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The Court will address the five-remaining ineffective-assistance-of-counsel grounds in turn below.

### i. Ground 2(1)

In Ground 2(1), Thomas alleges that his trial counsel failed to advise the state district court of his mental deficiencies at the time the plea was taken, failed to wait until the psychological report was completed prior to entering the plea, and failed to use any of the steps recommended by the expert to help him understand the plea process. (ECF No. 40 at 11.) Thomas elaborates that he needed extra assistance understanding the plea agreement and need not show that he was incompetent for the plea to fail a

knowingly-and-voluntarily-entered analysis. (*Id.* at 13.) In Thomas' appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant contends that trial counsel was ineffective for failing to ask the district court to assess his ability to enter a plea. Appellant has failed to demonstrate that counsel's performance was deficient or that he was prejudiced. Appellant's claim is based on the psychological evaluation that was conducted prior to his plea. However, as discussed above, neither the evaluation nor the evidence at the evidentiary hearing demonstrated that he was incompetent. Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 26-22 at 4-5.) The Nevada Supreme Court's rejection of Thomas' *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Thomas testified at the post-conviction evidentiary hearing that he and his trial counsel "didn't really discuss nothing [regarding the guilty plea agreement]." (ECF No. 25-12 at 11.) Rather, his trial counsel "told [him] that [his] codefendant, David Jones, signed his plea agreement and he needed [him] to sign the plea agreement." (*Id.*) Thomas' trial counsel did not read the plea agreement to him, did not go over the plea agreement with him, did not discuss the different levels of murder with him, did not discuss the charges or potential sentence with him, and did not discuss his constitutional rights with him. (*Id.* at 11, 13.) Thomas did not think that he was fully informed about the consequences of his plea and testified that he would have gone to trial if he had known that he was facing the possibility of life without parole. (*Id.* at 13-14.) Thomas acknowledged that he "read a little bit of the Guilty Plea Agreement." (*Id.* at 14.)

Thomas' trial counsel testified at the post-conviction evidentiary hearing that he went over the plea agreement with Thomas, explained the charges Thomas was pleading guilty to, and explained the potential sentences Thomas faced as a result of his guilty plea, which included the sentence of life without the possibility of parole. (ECF No. 25-12 at 18.) Thomas' trial counsel explained that he "spent quite a bit of time" with Thomas "making sure [he] underst[ood]d[ ] the Guilty Plea Agreement" was a contract

1    between Thomas and the State. (*Id.*) Thomas' trial counsel further explained that

2    because guilty plea agreements contain "lot[s] of legalese," he "always read[s] them

3    completely [to his clients] because" he "naturally assume[s] that everyone does not know

4    how to read." (*Id.* at 18-19.) And, "[a]s [he] go[es] along, [he] explain[s] what [the terms]

5    mean[ ] in lay terms." (*Id.* at 19.) Thomas' trial counsel testified that in his opinion

6    Thomas believed—at the time he entered the plea—that it was in his best interest to

7    accept the plea deal and that he had no doubt that Thomas was entering the plea

8    knowingly, intelligently, and voluntarily. (*Id.* at 18.)

9        Regarding Dr. Bradley, Thomas' trial counsel testified that he hired Dr. Bradley

10   for mitigation evidence for the penalty phase of Thomas' trial. (ECF No. 25-12 at 17-18.)

11   Dr. Bradley's report did not conclude that Thomas was incapable of assisting him, of

12   comprehending the charges against him, or distinguishing between guilty and not guilty.

13   (*Id.* at 18.) Instead, Thomas' trial counsel testified that he was "quite certain if Dr. Bradley

14   had any questions about [Thomas'] legal competency[,] . . . she would have very

15   immediately have said, wait, he cannot assist his defense." (*Id.* at 21.)

16       The Nevada Supreme Court reasonably determined that Thomas failed to

17   demonstrate that his trial counsel was deficient. *See Strickland*, 466 U.S. at 688. First,

18   Dr. Bradley's evaluation was not completed until after Thomas changed his plea. (*See*

19   ECF No. 24-12 at 59; ECF No. 23-15 at 2.) Therefore, Thomas' trial counsel had no

20   basis to alert the state district court of Thomas' slightly lower intellectual abilities at the

21   time of the change of plea hearing. Second, Thomas' trial counsel sought Dr. Bradley's

22   psychological evaluation for mitigation purposes, not as a basis to evaluate Thomas'

23   competency for him to enter a plea. (ECF No. 25-12 at 17-18.) As such, there was no

24   reason for Thomas' trial counsel to have waited for Dr. Bradley's report for Thomas to

25   change his plea. Third, Thomas' trial counsel testified that he used the steps

26   recommended by Dr. Bradley to assist Thomas in the comprehension of the plea

27   agreement and plea process. Contrary to Thomas' testimony that he and his trial counsel

28   "didn't really discuss nothing [regarding the guilty plea agreement]" (ECF No. 25-12 at

11), Thomas' trial counsel testified that he thoroughly explained the plea agreement to Thomas, read the plea agreement to Thomas, and explained the plea agreement in lay terms to Thomas. (*Id.* at 18-19.) These actions conform to Dr. Bradley's assessment that although Thomas "would have a lot of difficulty reading [the plea agreement] on his own," the contents of the plea agreement "could be communicated to Mr. Thomas through his attorney at a level that he might comprehend." (*Id.* at 6-8.)

Because the Nevada Supreme Court reasonably denied Thomas' claim, Thomas is denied federal habeas relief for Ground 2(1).

### ii.  Ground 2(2)

In Ground 2(2), Thomas alleges that his trial counsel failed to challenge the death penalty on the grounds that he was ineligible to be executed. (ECF No. 40 at 13.) Thomas contends that if the death penalty had been negated prior to the entry of his plea, there would have been no need for him to plead guilty to avoid it. (*Id.*)

This Court previously determined that this ground was unexhausted and subject to an anticipatory procedural default. (ECF No. 46 at 8-9.) Thomas previously argued that he could demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse the default because his post-conviction counsel was ineffective. (ECF No. 44 at 12.) This Court deferred consideration of Thomas' cause and prejudice argument under *Martinez* until the time of merits consideration. (ECF No. 46 at 10.)

In *Martinez*, the Supreme Court ruled that "when a State requires a prisoner to raise an ineffective-assistance-of-trial counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim" if "the state courts did not appoint counsel in the initial-review collateral proceeding" or "where appointed counsel in the initial-review collateral proceeding . . . was ineffective." 566 U.S. at 14. "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.*

In 2002, the United States Supreme Court "conclude[d] that [death] is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (internal quotation marks omitted). Two years later, in 2003, the Nevada Legislature added NRS § 174.098. At the time of Thomas' crime and conviction, NRS § 174.098(1) provided that "[a] defendant who is charged with murder of the first degree in a case in which the death penalty is sought, may . . . file a motion to declare that he is mentally retarded."[1] The statute defined "mentally retarded" as "significant subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior and manifested during the developmental period." NRS § 174.098(7). Before the entry of Thomas' change of plea, the Nevada Supreme Court had not "address[ed] the statutory definition of mentally retarded." *Ybarra v. State*, 247 P.3d 269, 273 (Nev. 2011).[2]

Dr. Bradley's mitigation evaluation was not completed until February 7, 2011 (ECF No. 24-12 at 59), which was approximately one month after Thomas changed his plea. (*See* ECF No. 23-15 at 2.) Accordingly, Thomas must demonstrate that his trial counsel had a basis to move to invalidate the death penalty based on information known to him prior to receiving Dr. Bradley's written evaluation.

Thomas' trial counsel testified at the post-conviction evidentiary hearing that he sought a psychological evaluation for mitigation purposes because "it's a death penalty case." (ECF No. 25-12 at 17.) Thomas' trial counsel explained that "[i]f the mitigation factors in fact outweigh the aggravating factors[,] then the jury cannot go any further and they cannot consider death as a possible penalty." (*Id.* at 18.) Thomas' trial counsel also testified that "if Dr. Bradley had any questions about [Thomas'] legal competency[,] . . . she would very immediately have said, [w]ait, he cannot assist his defense." (*Id.* at 21.)

[1]NRS § 174.098 has since been amended to change "mentally retarded" to "intellectually disabled."

[2]On March 3, 2011—approximately two months after Thomas' change of plea (*see* ECF No. 23-15) and a month before his sentencing (*see* ECF No. 23-18)—the Nevada Supreme Court discussed NRS § 174.098 in *Ybarra v. State*, 247 P.3d 269 (Nev. 2011).

Because Thomas' trial counsel sought a psychological evaluation due to the nature of Thomas' death penalty case—not due to his concerns about Thomas' intellectual abilities—and because Thomas' trial counsel explained that Dr. Bradley did not notify him prior to the completion of her report that she had any concerns about Thomas' competency,[3] Thomas fails to demonstrate that his trial counsel had a basis to move to invalidate the death penalty pursuant to NRS § 174.098 before the entry of his change of plea. Therefore, Thomas fails to demonstrate that his trial counsel was deficient. *See Strickland*, 466 U.S. at 688.

Further, this Court is also unable to conclude that a motion to invalidate the death penalty would have been fruitful even if Thomas' trial counsel had received Dr. Bradley's report prior to Thomas' change of plea hearing. Dr. Bradley testified that Thomas' IQ scores were "in between the mentally retarded range and average range." (ECF No. 25-12 at 6.) Thus, it is not clear that Thomas would have been classified as being "mentally retarded" pursuant to *Atkins* or NRS § 174.098. As such, Thomas fails to demonstrate that his trial counsel was deficient. *See Strickland*, 466 U.S. at 688; *see also Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982) ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.").

Because Thomas' ineffective-assistance-of-trial-counsel argument fails, Ground 2(2) is not substantial. Accordingly, Ground 2(2) is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### iii.  Ground 2(3)

In Ground 2(3), Thomas alleges that his trial counsel failed to file a notice of appeal on his behalf. (ECF No. 40 at 15.) In Thomas' appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

---

[3]Dr. Bradley met with Thomas twice before he pleaded guilty: on March 25, 2010 for two hours and on April 1, 2010 for forty minutes. (ECF No. 24-12 at 59.) She also conducted psychological testing on Thomas on April 13, 2010 before Thomas pleaded guilty. (*Id.*)

> [A]ppellant argues that trial counsel was ineffective for failing to file a direct appeal. Appellant has failed to demonstrate that counsel's performance was deficient. Counsel testified that appellant never asked him to file a direct appeal. Counsel testified that he spoke to appellant shortly after sentencing and explained to him that there was no meritorious issues to raise on direct appeal, and they agreed that appellant would file a post-conviction petition if he wished to seek relief. The district court found counsel's testimony to be credible, and we conclude that the district court did not err in denying this claim.

(ECF No. 26-22 at 6.) The Nevada Supreme Court's rejection of Thomas' *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

Thomas testified at his post-conviction evidentiary hearing that he requested that his trial counsel file an appeal for him "[t]he same morning or afternoon that [he] was sentenced." (ECF No. 25-12 at 10.) Thomas' trial counsel "visited [him] two days later and wrote down some stuff" telling him "to file a writ of habeas corpus when [he] get[s] out of intake" at the prison. (*Id.* at 11, 13.) Thomas' trial counsel never filed an appeal on Thomas' behalf, and Thomas never changed his mind about wanting to appeal. (*Id.* at 11.) When asked what grounds he wanted his trial counsel to include in a direct appeal, Thomas responded: "I don't know what grounds he could have raised besides him saying I was going to get [life] with the possibility [of parole]. I just wanted him to appeal that decision and give me what he said I was going to get." (*Id.* at 16.)

Thomas' trial counsel testified at the post-conviction evidentiary hearing that he had never refused to file an appeal when a client requested that one be filed. (ECF No. 25-12 at 19.) Rather, if a client asked him to file an appeal, he "immediately file[d] a notice of appeal because . . . it's a statutorial [sic] jurisdictional issue." (*Id.*) Here, although Thomas was unhappy with his sentence in light of his co-defendants' sentences, Thomas did not ask his trial counsel to file an appeal and he did not think that there were any meritorious issues for Thomas to appeal. (*Id.* at 19-21.) Thomas' trial counsel explained that he and Thomas "talked about the fact that because he had pled guilty[,] there were a limited number of issues that he could raise on appeal, one of

which being the 8th Amendment, cruel and unusual punishment, because he had negotiated down to life without the possible of parole." (*Id.* at 19.) However, Thomas' trial counsel "told him that had no traction" and would be a waste of his time. (*Id.*) Instead, Thomas' trial counsel advised him that "[i]f he intended to [bring a] challenge[,] . . . he needed to . . . file a writ of habeas corpus . . . and challenge that [his trial counsel] was ineffective." (*Id.*) Thomas "agreed that the appeal was going to be spinning wheels." (*Id.* at 21.)

The *Strickland* "test applies to claims . . . that counsel was constitutionally ineffective for failing to file a notice of appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). When counsel "disregards specific instructions from the defendant to file a notice of appeal," counsel has acted unreasonably. *Id.* However, "where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken" the question is "whether counsel in fact consulted with the defendant about the appeal." *Id.* at 478. Consulting means "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.*

Thomas fails to demonstrate that his trial counsel disregarded specific instructions to file an appeal or failed to consult with him about his wishes regarding an appeal in violation of the standards outlined in *Flores-Ortega*. 528 U.S. at 477-78. Thus, the Nevada Supreme Court reasonably determined that Thomas failed to demonstrate that his trial counsel was deficient. *See Strickland*, 466 U.S. at 688.

Even if Thomas requested that his trial counsel file an appeal at the conclusion of his sentencing hearing as he claims (ECF No. 25-12 at 10), both parties agree that a meeting was held two days later to discuss Thomas' next steps. (*Id.* at 11, 13, 19.) During that discussion, Thomas' trial counsel testified that he discussed possible appealable issues with Thomas and after explaining that those appealable issues lacked

traction,[4] recommended that Thomas pursue a writ of habeas corpus instead. (*Id.* at 19.) Thomas' testimony supports the latter portion of this testimony, as he also explained that he and his trial counsel discussed a habeas petition at this meeting. (*Id.* at 13.) Based on Thomas' trial counsel's testimony, Thomas then agreed with his trial counsel's recommendation and agreed to pursue the habeas petition instead of an appeal. (*Id.* at 21.) Because the record—fueled mostly by Thomas' trial counsel's testimony—supports a finding that Thomas did not desire to—or no longer desired to—file an appeal following his consultation with his trial counsel, Thomas fails to meet his burden of proving the ineffectiveness of his trial counsel in not filing an appeal.

Because the Nevada Supreme Court reasonably denied Thomas' claim, Thomas is denied federal habeas relief for Ground 2(3).

### iv.  Ground 2(4)

In Ground 2(4), Thomas alleges that his trial counsel misrepresented his sentence, having promised him a sentence of life with the possibility of parole. (ECF No. 40 at 17.) In Thomas' appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that trial counsel was ineffective for misrepresenting that appellant would receive a sentence of life with the possibility of parole if he entered a plea. Appellant has failed to demonstrate that counsel's performance was deficient or that he was prejudiced. Counsel testified that he never promised appellant a sentence of life with the possibility of parole. Appellant was informed in the written plea agreement that life without the possibility of parole was a potential sentence, and he affirmed at the plea canvass his understanding that the sentence was entirely within the district court's discretion. Therefore, we conclude that the district court did not err in denying this claim.

---

[4] It is noted that Thomas' plea agreement provided that he understood that he was "waiving and forever giving up" the "right to appeal the conviction . . . unless the appeal [was] based upon reasonable constitutional jurisdictional or other grounds that challenge the legality of the proceedings and except as otherwise provided in subsection 3 of NRS 174.035." (ECF No. 23-16 at 7.)

1    (ECF No. 26-22 at 5.) The Nevada Supreme Court's rejection of Thomas' *Strickland*

2    claim was neither contrary to nor an unreasonable application of clearly established law

3    as determined by the United States Supreme Court.

4            As was explained in Ground 1, Thomas' plea agreement provided the following

5    potential sentences for murder with the use of a deadly weapon upon a person 60 years

6    of age or older: life without the possibility of parole plus a consecutive term of one to

7    twenty years for the deadly weapon and age enhancements, life with the possibility of

8    parole after twenty years plus a consecutive term of one to twenty years for the deadly

9    weapon and age enhancements, or 20 to 50 years plus a consecutive term of one to

10   twenty years for the deadly weapon and age enhancements. (ECF No. 23-16 at 3.)

11   Thomas' guilty plea agreement also provided that Thomas had "not been promised or

12   guaranteed any particular sentence by anyone" and that he knew "that [his] sentence

13   [was] to be determined by the Court within the limits prescribed by statute." (*Id.* at 5.)

14   Similarly, during Thomas' plea canvass, the state district court asked whether Thomas

15   understood "that the matter of sentencing [was] entirely up to" it, and Thomas answered

16   in the affirmative. (ECF No. 23-15 at 7.)

17           Thomas later testified at the post-conviction evidentiary hearing that his trial

18   counsel told him before their meeting in which he signed the guilty plea agreement that

19   he would receive a sentence of life with the possibility of parole. (ECF No. 25-12 at 12.)

20   Thomas, however, acknowledged that the plea agreement "had life without [parole] in

21   there, too, but the reason [he] was signing it was for life with." (*Id.*) Contrarily, Thomas'

22   trial counsel testified at the post-conviction evidentiary hearing that he did not tell or

23   promise Thomas that he would receive a sentence of life with the possibility of parole.

24   (ECF No. 25-12 at 18.)

25           The Nevada Supreme Court reasonably determined that Thomas' trial counsel

26   was not deficient. *See Strickland*, 466 U.S. at 688. Indeed, the record fails to support

27   Thomas' allegation that his trial counsel told him that he would receive a sentence of life

28   with the possibility of parole. First, Thomas' plea agreement included the possibility that

he could be sentenced to life without the possibility of parole. (ECF No. 23-16 at 3.) Second, Thomas acknowledged in the plea agreement and during his plea canvass that sentencing was up to the state district court, not his trial counsel. (*Id.* at 5; ECF No. 23-15 at 7.) Finally, Thomas' trial counsel testified that he never told Thomas that he would receive a sentence of life with the possibility of parole. (ECF No. 25-12 at 18.) Therefore, Thomas fails to meet his burden of proving the ineffectiveness of his trial counsel, so the Nevada Supreme Court reasonably denied Thomas' claim. Thomas is denied federal habeas relief for Ground 2(4).

### v.  Ground 2(5)

In Ground 2(5), Thomas alleges that his trial counsel misrepresented the role of an investigator. (ECF No. 40 at 17.) Thomas elaborates that his trial counsel told him that the investigator from the Special Public Defender's Office was "a death row attorney," and that based on this misrepresentation, he placed extra weight on what she said. (*Id.*) In Thomas' appeal of the denial of his state habeas petition, the Nevada Supreme Court held:

> [A]ppellant argues that trial counsel was ineffective for coercing him into pleading guilty by having an investigator from the Public Defender's Office speak to appellant about the life of an inmate on death row. He asserts that trial counsel misrepresented to him that the investigator was actually a "death row attorney." Appellant has failed to demonstrate that counsel's performance was deficient or that he was prejudiced. Counsel testified that he asked the investigator to provide appellant with an accurate understanding of life on death row so that appellant would be able to make an informed decision as to whether to enter a guilty plea. Counsel denied ever representing to appellant that the investigator was an attorney. Furthermore, in entering the plea, appellant acknowledged that he was not forced to enter a plea and was entering his plea of his own free will. Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 26-22 at 5.) The Nevada Supreme Court's rejection of Thomas' *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

1    Thomas testified at the post-conviction evidentiary hearing that on December 17,

2    2010, his trial counsel "brought a lady from the Public Defender's Office," named Maribel

3    Rosales, to see him. (ECF No. 25-12 at 12-13.) Thomas' trial counsel told Thomas that

4    Rosales was "his best friend and . . . an appellate death row attorney." (*Id.* at 13.) Later,

5    during his state habeas proceedings, Thomas learned that Rosales was an investigator,

6    not an attorney. (*Id.*) Thomas testified that if he had known that Rosales was not an

7    attorney, he would not have discussed his case with her. (*Id.*)

8    Thomas' trial counsel testified at the post-conviction evidentiary hearing that he

9    had Rosales speak with Thomas "to talk with him about what death row would actually

10   mean," to make sure he understood the "[c]onditions of being in general population or

11   being on death row," and "to discuss whether taking a deal was a good idea." (ECF No.

12   25-12 at 19.) Thomas' trial counsel explained that "some people have a mistaken belief

13   that life on death row is in some way more livable and it's not. It is as harsh an

14   environment as you can have." (*Id.*) Thomas' trial counsel testified that Rosales did not

15   introduce herself as a death row attorney; rather, he explained that "[s]he [was] a legal

16   specialist with the Public Defender's Office," whom he requested permission from the

17   Special Public Defender's Office to contact. (*Id.*)

18   The Nevada Supreme Court reasonably determined that Thomas' trial counsel

19   was not deficient. *See Strickland*, 466 U.S. at 688. Although Thomas alleges that

20   Rosales was introduced to him as an attorney, Thomas' trial counsel's testimony at the

21   post-conviction evidentiary hearing rebutted that allegation. Indeed, Thomas' trial

22   counsel explained that he told Thomas that Rosales was "a legal specialist with the

23   Public Defender's Office." (ECF No. 25-12 at 19.) Due to Thomas' trial counsel's

24   testimony, which dispels Thomas' allegations, Thomas fails to meet his burden of

25   proving the ineffectiveness of his trial counsel. As such, the Nevada Supreme Court

26

27

28

1  reasonably denied Thomas' claim, and Thomas is denied federal habeas relief for

2  Ground 2(5).[5]

3  ## V.  CERTIFICATE OF APPEALABILITY

4  This is a final order adverse to Thomas. Rule 11 of the Rules Governing Section

5  2254 Cases requires this Court to issue or deny a certificate of appealability ("COA").

6  Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability

7  for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851,

8  864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when

9  the petitioner "has made a substantial showing of the denial of a constitutional right." With

10  respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable

11  jurists would find the district court's assessment of the constitutional claims debatable or

12  wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S.

13  880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists

14  could debate: (1) whether the petition states a valid claim of the denial of a constitutional

15  right; and (2) whether the court's procedural ruling was correct. *See id.* Applying this

16  standard, the Court finds that a certificate of appealability is unwarranted.

17  ## VI.  CONCLUSION

18  It is therefore ordered that the First Amended Petition for Writ of Habeas Corpus

19  Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Not Sentenced to Death)

20  (ECF No. 40) is denied.

21  It is further ordered that Petitioner is denied a certificate of appealability.

22  ///

23  _____

24  [5]Thomas requested that this Court "[c]onduct an evidentiary hearing which proof may be offered concerning the allegations in [his] amended petition and any defenses

25  that may be raised by Respondents." (ECF No. 40 at 20.) Thomas fails to explain what evidence would be presented at an evidentiary hearing, especially since an evidentiary

26  hearing was held before the state district court on Thomas' state habeas petition. Additionally, this Court has already determined that Thomas is not entitled to relief, and

27  neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. Accordingly,

28  Thomas' request for an evidentiary hearing is denied.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 27th day of May 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE